IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allen C. Bender, Individually :
and as Executor of the Estate of :
Ruth A. Bender, :
     Appellant :
           :
           :
    v.       :
           :
Commonwealth of Pennsylvania, :
Department of Transportation, :
Township of Swatara, and : No. 77 C.D. 2019
Adrian T. Horrell : Submitted: May 11, 2020


BEFORE: HONORABLE RENÉE COHN JUBELIRER, Judge
     HONORABLE CHRISTINE FIZZANO CANNON, Judge
     HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON    FILED: June 30, 2020


    Allen C. Bender, individually and as executor of the estate of Ruth A. Bender, appeals from the November 21, 2018 orders entered by the Court of Common Pleas of Dauphin County (trial court) granting the motions for reconsideration and summary judgment filed by the Commonwealth of Pennsylvania, Department of Transportation (PennDOT) and Swatara Township (Township).[1] We affirm the trial court's orders.

---

[1] The trial court also granted the motion for reconsideration filed by Adrian T. Horrell but, upon review, by order of the same date denied his request for summary judgment. Reproduced Record (R.R.) at 7a. Horrell is not participating in this appeal.

Ruth A. Bender died after being struck by a vehicle operated by Adrian T. Horrell (Horrell) while attempting to walk across Eisenhower Boulevard. Amended Complaint ¶¶ 8-10. Allen C. Bender (Bender), Ruth A. Bender's surviving spouse and executor of her estate, filed two wrongful death and survival actions, one against Adrian T. Horrell and another against PennDOT and the Township. Reproduced Record (R.R.) at 4a. The trial court consolidated the two actions.

In his action against PennDOT and the Township, Bender alleged that his wife crossed Eisenhower Boulevard, a state highway, a short distance north of its intersection with Highland Street, a township road, directly in front of Gilligan's Restaurant. Amended Complaint ¶ 5. Bender alleged that there had been frequent pedestrian travel across Eisenhower Boulevard by patrons of the restaurant and that, prior to this incident, several other pedestrians had been hit by vehicles where his wife was hit. *Id*. ¶¶ 8, 12. Bender further alleged that PennDOT and the Township were negligent for failing to provide facilities for safe pedestrian travel where his wife had crossed or at the intersection between Eisenhower Boulevard and Highland Street. *Id*. ¶¶ 13, 15. Though PennDOT and the Township are government entities and typically immune from liability, Bender alleged that his action against PennDOT fell within the real estate exception to sovereign immunity, which waives immunity when the injury was caused by a "dangerous condition of Commonwealth agency real estate." *Id*. ¶ 18; *see also* 42 Pa.C.S. § 8522(b)(4). Similarly, with respect to his claim against the Township, Bender alleged that his action fell within the "trees, traffic controls and street lighting" exception to governmental immunity. Amended Complaint ¶ 19; *see also* 42 Pa.C.S. § 8542(b)(2).

During discovery, Bender presented an expert report by traffic engineer Kevin E. O'Conner, P.E., dated May 19, 2017. R.R. at 235a-46a. The expert

2

conducted an onsite investigation and reviewed the accident report, photos, a traffic signal permit file, PennDOT crash summaries, and transcripts of eight depositions. *Id*. at 236a. Based upon his review of the foregoing, the expert concluded that the lack of adequate pedestrian facilities created a dangerous condition for pedestrians attempting to cross Eisenhower Boulevard and this dangerous condition was a substantial factor in causing Bender's wife's death. *Id*. at 245a. The expert opined that PennDOT and the Township should have made improvements to the intersection, including at a minimum, marked crosswalks, visible and conveniently located pedestrian push buttons, and sidewalks. *Id*. The expert did not opine as to the feasibility of the improvements that he claimed should be made to the intersection and did not offer an opinion as to the effect on the proposed improvements upon the traffic control in the vicinity of the intersection. *Id*. at 245a-46a.

Additionally, the expert submitted an affidavit wherein he stated that he did not engage in an engineering study to determine the appropriate improvements on Eisenhower Boulevard between the Highland Street and Lindle Road intersections because it would not be financially feasible for a party to a lawsuit. R.R. at 293a. In the affidavit, the expert stated that the "pedestrian safety problems have developed over the years as the area was developed" and "[t]he Township and PennDOT should have addressed these problems as the development occurred." *Id*. at 293a-94a.

After discovery was complete, PennDOT and the Township filed motions for summary judgment. R.R. at 129a-54a, 164a-84a. In their motions, PennDOT and the Township asserted that Bender's expert report was deficient and, as a result, Bender failed to establish a duty owed by PennDOT and the Township. *Id*. at 131a-32a, 169a-73a. In the absence of a duty owed, PennDOT and the

3

Township asserted that they could not be held liable under their respective exceptions to immunity. *Id*. at 131a-32a, 173a. By separate orders dated December 29, 2017, the trial court judge, The Honorable Lori K. Serratelli, denied the motions for summary judgment filed by PennDOT and the Township. *Id*. at 323a-26a. Subsequently, on December 31, 2017, Judge Serratelli's term expired and the case was transferred to another trial court judge, The Honorable John F. Cherry (the successor judge). Trial Court Opinions and Orders dated 11/21/18, n.1.

On January 11, 2018, PennDOT and the Township filed motions for reconsideration of the December 29, 2017 orders denying their motions for summary judgment. R.R. at 327a-30a, 373a-76a. The parties filed briefs on the matter and the successor judge held oral argument on their requests for reconsideration. *Id*. at 7a. By orders dated November 21, 2018, the successor judge granted the requests for reconsideration and the motions for summary judgment thereby dismissing the claims asserted by Bender against PennDOT and the Township. *See* Trial Court Opinions and Orders. Bender appeals to this Court for review.[2]

On appeal,[3] Bender presents three questions for review:

[2] On December 13, 2018, Bender filed an application for a determination of finality with the trial court pursuant to Pennsylvania Rule of Appellate Procedure 341(c), but by order dated January 17, 2019, the trial court deemed it denied. R.R. at 7a. Thereafter, on January 18, 2019, Bender filed a petition for review with this Court, which was denied as untimely by order dated March 6, 2019. R.R. at 7a. Bender filed a motion for reconsideration of this Court's March 6th order, which was granted. *Id*. at 8a. By order dated June 14, 2019, this Court granted Bender's petition for review and directed that it be treated as a notice of appeal of the trial court's decisions dated November 20, 2018. Cmwlth. Ct. Order dated 6/14/19. In our June 14th order, this Court explained that the trial court erred by refusing to amend its November 21, 2018 order to include an "express determination that an immediate appeal would facilitate resolution of the entire case" and that "the [trial] court abused its discretion in failing to certify the interlocutory orders for immediate appeal." *Id*.

[3] Our standard of review of the grant of summary judgment is *de novo* and our scope of review is plenary. *Pyeritz v. Commonwealth*, 32 A.3d 687, 692 (Pa. 2011). A motion for summary judgment is properly made if "there is no genuine issue of any material fact as to a necessary element of the cause of action." Pa.R.C.P. No. 1035.2(1). "Summary judgment may be entered

A. Did the [trial] court err by granting reconsideration of the determination of a judge of the same court in the same case?

B. Did the [trial] court err by concluding that Bender's claims against PennDOT and [the] Township are barred by statutory immunity?

C. Did the [trial] court err by determining that Bender's expert report is legally insufficient as a matter of law?

Bender's Brief at 3.

First, Bender asserts that the successor judge erred when he reconsidered and reversed the initial judge's order denying summary judgment and, in doing so, violated the coordinate jurisdiction rule. Bender's Brief at 10 & 13-15. We disagree. The coordinate jurisdiction rule is encompassed within the law of the case doctrine and provides that "judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions." *Zane v. Friends Hosp.*, 836 A.2d 25, 29 (Pa. 2003).

> However, this rule is not absolute as there are times when a judge cannot avoid placing himself or herself in such a position due to the death, retirement, or expiration of the judicial commission of his or her predecessor. . . Thus, where a successor judge is asked by a timely and proper motion to reconsider the legal conclusion of an unavailable predecessor, he or she is empowered to reconsider those issues to the same extent that his or her predecessor could have.

only when, after examining the record in the light most favorable to the non-moving party, and resolving of all doubts as to the existence of a genuine issue of material fact against the moving party, the moving party is clearly entitled to judgment as a matter of law." *Pyeritz*, 32 A.3d at 692. This Court, in the exercise of our appellate review, may reverse a trial court's order only for abuse of discretion or an error of law. *Pentlong Corp. v. GLS Capital, Inc.*, 72 A.3d 818, 823 n.6 (Pa. Cmwlth. 2013).

5

*Hutchison v. Luddy*, 611 A.2d 1280, 1289 (Pa. Super. 1992) (citations omitted).[4]

Here, the judge that imposed the initial order was no longer with the trial court as she retired. *See* Trial Court Opinions and Orders, n.1. The motion filed with the successor judge was a motion for reconsideration of the prior judge's orders denying summary judgment to PennDOT and the Township. Because the prior judge assigned to this matter was no longer on the court, PennDOT's and the Township's motion for reconsideration had to be considered, out of necessity, by another judge on the same court. *Hutchison*, 611 A.2d at 1289. Therefore, the coordinate jurisdiction rule is not implicated here.

Next, we address Bender's contention that the trial court erred by determining that his expert report was legally insufficient as a matter of law because it provided "no engineering study which addresses the appropriateness of [the] proposed changes." Bender's Brief at 27. The trial court concluded that Bender's expert report was legally insufficient pursuant to *Starr v. Veneziano*, 747 A.2d 867 (Pa. 2000), and *Wenger v. West Pennsboro Township*, 868 A.2d 638, 645 (Pa. Cmwlth. 2005), in that the report failed to rely upon an engineering study which addressed the appropriateness of the proposed changes. Bender's Brief at 3.

To this Court, Bender argues that the trial court's reliance on *Starr* was misplaced. Bender's Brief at 28. Though Bender agrees that *Starr* held that an expert opinion is generally required for a plaintiff to show the appropriateness of a traffic control device to regulate traffic, he submits that *Starr* requires "nothing more" than is necessary for any expert opinion and does not require an engineering study, a traffic investigation, or any particular kind of study, investigation, analysis,

---

[4] This Court is "not bound by the Superior Court's precedents, but we may adopt the Superior Court's reasoning where persuasive." *Commonwealth v. Irland*, 153 A.3d 469, 482 (Pa. Cmwlth. 2017) (citing *Wertz v. Chapman Twp.*, 709 A.2d 428, 433 n.8 (Pa. Cmwlth. 1998)).

evaluation, or review. *Id.* at 28-29. To this end, Bender asserts that his expert undertook an evaluation and that

> [h]e spent considerable time and effort reviewing relevant documents, information, crash data, deposition testimony, traffic signal plans and permits, and personally examined the site and took photographs and pedestrian counts. He concluded that the lack of adequate pedestrian facilities created a dangerous condition for pedestrians attempting to cross Eisenhower Boulevard. He pointed out that the commercial development in the area created the pedestrian safety problems, which should have been addressed through appropriate pedestrian facilities as the development occurred. His opinions are expressly given based upon a reasonable degree of engineering certainty. This is all that is required of any expert witness.

*Id.* at 29-30. Bender further argues that *Starr* "involved only a contention that an intersection was unsafe because a specific control device ("no left turn" sign) had not been installed" and here, Bender's claim is that "an entire section of highway was unsafe for pedestrians to cross." *Id.* at 27. Additionally, Bender contends that *Wenger* actually supports his position as *Wenger* provided that *Starr* does not require an expert to undertake any particular type or nature of study. *Id.* at 28.

In response, PennDOT contends that *Starr* governs this matter and that Bender had to produce an expert report supported by a traffic and engineering study to meet his burden of showing that PennDOT owed a duty to make the proposed changes. PennDOT's Brief at 15. PennDOT asserts that the trial court's order is supported by this Court's decision in *Kosmack v. Jones*, 807 A.2d 927, 929-30 (Pa. Cmwlth. 2002), where this Court held that an expert opinion was insufficient as a matter of law under *Starr* because the opinion was not based upon an engineering study and was, therefore, purely speculative. *Id.* at 19. PennDOT asserts that

7

*Wenger* "lends no support to Bender's position" and "actually supports PennDOT's position as to the legal inadequacy of the [expert report]." *Id*. at 27. The Township agrees that Bender's report was legally insufficient pursuant to *Starr*, *Kosmack,* and *Wenger.* Township's Brief at 22-24.

We begin our analysis with a review of *Starr*, *Kosmack*, and *Wenger*. The Supreme Court in *Starr* held that, like PennDOT,[5] a municipality has a duty to install appropriate traffic control devices on roadways within its purview "relative to streets that it controls." *Starr*, 747 A.2d at 872. The Supreme Court explained that a municipality has a duty to "maintain its roadways free of dangerous conditions" and this "could include a duty to install an appropriate traffic control device where to do so would alleviate a known dangerous condition." *Id.* The Supreme Court further considered how a plaintiff could establish a duty of care on the part of a municipality related to the installation of a traffic control device by adopting a three-part test. *Id.* at 873. The Court explained that a plaintiff must demonstrate that

> 1) the municipality had actual or constructive notice of the dangerous condition that caused the plaintiff's injuries; 2) the pertinent device would have constituted an appropriate remedial measure; and 3) the municipality's authority was such that it can fairly be charged with the failure to install the device.

*Id.* We focus our analysis on the second and third elements.

---

[5] In *Starr*, the Supreme Court cited to its prior decision in *Bendas v. Township of White Deer*, 611 A.2d 1184 (Pa. 1992), where it held that PennDOT has a duty to install appropriate traffic control devices at intersections if the failure to do so would create a dangerous condition. *Starr*, 747 A.2d at 871. The Supreme Court explained that "the duty of care a Commonwealth agency owes to those using its real estate . . . is such as to require that the condition of the property is safe for the activities for which it is regularly used, intended to be used or reasonably foreseen to be used." *Id*. at 872.

To establish the second element, appropriateness of the proposed remedial measure, the plaintiff must

> demonstrate that the relevant control would have constituted *a proper and effective measure to mitigate the hazard at the intersection.* This requirement arises naturally from the nature of the duty alleged, as it would be both illogical and contrary to public policy to deem a governmental entity obligated to install or erect a device which would be inappropriate *to the location at issue. . . .*
>
> In this regard, it is important to note that, under the Vehicle Code [75 Pa.C.S. §§ 101-9805], the Commonwealth and its subdivisions may not erect traffic control devices unless it is first determined, *based upon a traffic and engineering investigation, that a particular device is an appropriate means of regulating traffic. . . .* These statutes and regulations reflect the concern that some devices may have undesirable effects upon *the larger system of traffic regulation and control that preclude their use in certain locations.* Because the determination of appropriateness entails consideration of principles and methods of traffic engineering that are beyond the scope of a layman's training, expert opinion expressed within a reasonable degree of engineering certainty is generally required for the plaintiff to meet this requirement. . . .

*Starr*, 747 A.2d at 873 (citations omitted) (emphasis added).

To establish the third element, a plaintiff must show that the municipality has sufficient authority to make the proposed changes. *Id*. at 874. In this regard, the Supreme Court in *Starr* explained that under the facts before it, the Vehicle Code provided that only the township had authorization to install a no-left-turn sign on the township road. *Id*. However, for the township to install the proposed

9

device, PennDOT's approval was a "necessary prerequisite to the ultimate exercise of such authority" and, therefore, the plaintiff will

> necessarily be required to prove that, more likely than not, PennDOT's approval would have been forthcoming. Since *the Vehicle Code and PennDOT regulations preclude such approval in [the] absence of a traffic and engineering investigation confirming that a traffic control measure is appropriate to the location in question*, in order to meet their burden of proof concerning the municipality's authority, plaintiffs will necessarily be required to *provide expert opinion concerning the results of such a study*. In other words, where the duty alleged is a duty to erect or install a traffic control device, the "authority" requirement will necessarily subsume the "appropriateness" requirement.

*Id*. at 874-75 (footnote omitted). Because the plaintiff's expert's opinion in *Starr* had no foundation concerning the impact of the proposed device upon the locality of the dangerous condition, it was insufficient to establish a legal duty on the part of the Township to implement a traffic control measure. *Id*. at 875.

In *Kosmack*, this Court applied the Supreme Court's analysis in *Starr* to cases involving PennDOT. In *Kosmack*, plaintiff sued PennDOT as a result of a multi-car accident that occurred on a state highway during a snowstorm that substantially reduced visibility. *Kosmack*, 807 A.2d at 929. The plaintiff produced an expert report concluding that the highway design and lack of a snow fence on a state highway were substantial causative factors in bringing about the accidents at issue. *Id*. at 930. The jury found liability on the part of PennDOT, and awarded damages and PennDOT appealed. *Id*.

In evaluating the adequacy of the expert's opinion and testimony, this Court in *Kosmack* stated that, "[a]though *Starr* was written in the context of a

10

municipality's duty to take remedial measures where a dangerous condition becomes known, we believe its analysis applies with equal force to the duty of [PennDOT] to adopt particular design standards in the first instance." *Id*. at 931. This Court held that the expert's testimony was insufficient to meet the second factor, the appropriateness requirement of the remedial measures. *Id*. Specifically, this Court explained:

> Merely to suggest, as appellees' expert does, that lowering the grade of the road would have diminished the tendency of snow to blow across the highway is insufficient, inasmuch as appellees' expert must establish that a proposed solution *is both feasible and beneficial to the overall safety of the highway*. The lack of such testimony is particularly troubling given the complexity and number of engineering and regulatory issues which must be considered in designing a highway such as the one at issue in this case. . . .

> Furthermore, beyond conclusory statements that a snow fence would have mitigated the effects of blowing snow, the expert's report and testimony are lacking in specificity with regard to the appropriateness of a snow fence at remedying *the specific dangerous condition at the particular location at issue*. . . . [T]he expert's testimony on both direct and cross-examination lacks such salient details as the height, location, and material composition of a fence that would have effectively mitigated visibility problems from blowing snow at the scene of the accident.

> Finally, as with the road design, [the expert's] testimony does not suggest to what degree a snow fence might have improved the conditions which led to the accidents.

*Kosmack,* 807 A.2d at 931 (emphasis in original and added). Based on the foregoing, this Court concluded that the "clear mandate of *Starr* is that a plaintiff must show

11

that a proposed solution would effectively remedy a specific dangerous condition at a particular location." *Id*. at 932.

Subsequently, this Court in *Wenger* considered whether summary judgment was appropriate in a lawsuit against a township resulting from an accident on township roads. The trial court in *Wenger* noted that the expert report "lacked a traffic study, an analysis of prior accidents, proper sight distance measurements and an analysis of how the proposed change would affect the existing traffic system." *Wenger*, 868 A.2d at 643. The trial court therefore concluded that plaintiff's expert failed to produce the "required traffic and engineering studies to support the alleged need for additional traffic control devices at the intersection and to establish that [PennDOT] would have approved the installation of such devices." *Id*. at 640. Applying the *Starr* factors, this Court reversed the trial court and concluded that the expert report was sufficient, and, therefore, summary judgment was inappropriate. *Id*. This Court concluded "that the holding in *Starr* does *not* require a plaintiff's expert to undertake and/or document an engineering and traffic investigation in accordance with any particular [PennDOT] regulation." *Id*. at 643.

Notably, however, unlike the intersections in *Starr* and *Kosmack,* and unlike the intersection at issue in this matter, *Wenger* involved an intersection that was under the sole jurisdiction of a township, and accordingly, PennDOT approval was not required before installing a traffic control device. *See Wenger*, 868 A.2d at 643. In such a situation, a plaintiff need not establish that PennDOT approval would have been forthcoming by satisfying the dictates of the Vehicle Code and the regulations promulgated thereunder. *Id*. Indeed, we clarified in *Wenger* that in cases where PennDOT approval is a "prerequisite to municipal action, a plaintiff's expert must support his or her opinion as to the appropriateness with an analysis of the same facts that [PennDOT] would consider when its approval is sought." *Id*. Therefore,

12

under *Wenger*, in cases when PennDOT approval is not necessary, then there must be some factual predicate for the opinion identified on the record and the opinion must meet the requirements for admissibility pursuant to Pennsylvania Rule of Evidence 702. *Id.*

In the present matter, Bender's expert opined that the lack of adequate pedestrian facilities created a dangerous condition for pedestrians attempting to cross Eisenhower Boulevard. R.R. at 235a-46a. Bender's expert stated:

> Based on my review and analysis of the available information it is my opinion to a reasonable degree of engineering certainty that the lack of adequate pedestrian facilities along . . . Eisenhower Boulevard that included the site of [Bender's wife's] crash, created a dangerous condition for pedestrians attempting to cross Eisenhower Boulevard that was a substantial factor in causing the crash that resulted in [Bender's wife's] death.
> . . . .
> In my opinion, [Township] and PennDOT, should have made improvements to the intersection of Eisenhower Boulevard and Highland Street safer [sic] and would have both facilitated and encouraged pedestrian use[,] including at a minimum; marked crosswalks, readily visible and conveniently located pedestrian push buttons, and sidewalks that would have provided direct and convenient access to the push buttons and crosswalks. It is also my opinion that, in my experience, these kinds of improvements would be approved for use by PennDOT and are commonly installed at signalized intersections where there is pedestrian activity.

R.R. at 245a. Further, Bender's expert stated:

> Had pedestrians been provided with a safe and convenient method for crossing Eisenhower Boulevard at Highland Street and between Highland Street and Lindle Road many, if not all of the pedestrian crashes that have

13

occurred including [Bender's wife's crash] would have been prevented.

All of my opinions have been expressed to a reasonable degree of engineering certainty.

*Id*. at 246a. Additionally, Bender's expert submitted an affidavit stating that in formulating his opinion he did not rely upon a traffic or engineering study because to engage in such a study would not be financially feasible. *Id*. at 293a.

Here, Bender's expert report is offered to establish the existence and the breach of a duty of care owed by PennDOT and Township to remedy a dangerous condition along Eisenhower Boulevard, a state highway, at its intersection with Highland Street. Bender proposes making "improvements" to the intersection of Eisenhower Boulevard and Highland Street to facilitate and encourage pedestrian use, including at a minimum "marked crosswalks, readily visible and conveniently located pedestrian push buttons, and sidewalks that would have provided direct and convenient access to the push buttons and crosswalks." R.R. at 245a.[6] Though Bender is proposing improvements to a state-designated highway that would affect pedestrian traffic, Bender's expert did not perform a traffic or engineering investigation to ascertain whether the proposed changes would effectively remedy the dangerous condition at the particular intersection or what the net effect of the

---

[6] Although Bender references in his brief a fourth measure recommended by his expert, namely signalized mid-block crosswalks, Bender's Brief at 32, such measure was not included in the expert report that is part of the original record in this matter. To the extent that such measure was included in a supplemental report authored by Bender's expert on March 13, 2018, Bender's Brief at 8, 32, this report is not part of the record and we agree with the Township, Township's Brief at 23, that it cannot be considered by this Court. *See* Pa.R.A.P. 1921 (stating, "[t]he original papers and exhibits filed in the lower court, paper copies of legal papers filed with the prothonotary by means of electronic filing, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the lower court shall constitute the record on appeal in all cases"); Pa.R.A.P. 1921, Note (stating "appellate court may consider only the facts which have been duly certified in the record on appeal").

14

proposed changes would be on the larger system of traffic control at the intersection. *Starr*, 747 A.2d at 873-74; *Kosmack*, 807 A.2d at 931. There is no way to determine whether Bender's expert's proffered improvements could have a deleterious impact on the intersection or on safety in the area and, therefore, the opinion fails to meet the appropriateness element provided in *Starr*.

Bender, however, argues that an engineering study is not necessary because the proposed changes he suggested would not require PennDOT approval and, therefore, *Wenger* applies here. Bender's Brief at 32. Bender argues that a municipality does not need PennDOT approval to install crosswalk markings on a state highway, *see* 67 Pa. Code § 212.5(b)(iv)(C), and that sidewalks are not identified as traffic control devices. *Id.* Further, Bender appears to argue that because push buttons already exist at the intersection, and his expert merely suggested replacing/relocating the push buttons to make them more visible and conveniently located, PennDOT approval is not required. *Id.*

Bender is correct that PennDOT approval is not required for crosswalk markings and that sidewalks are not specifically identified as traffic control devices under the applicable PennDOT regulations. These, however, are not the only changes recommended by Bender's expert, as he also recommended replacing/relocating the existing pedestrian push buttons at the signalized intersection at Highland Street. The regulations, as authorized by the Vehicle Code, require PennDOT approval for such a change.

Section 6109 of the Vehicle Code sets forth those actions presumed to be reasonable exercises of police powers of local authorities and PennDOT relative to local streets and roads as well as state highways. *See generally* 75 Pa.C.S. § 6109. Section 6109(d) provides that PennDOT may require "local authorities to obtain [PennDOT] approval in advance of regulating traffic on State-designated highways

15

within their physical boundaries." 75 Pa.C.S. § 6109(d). Section 6109(e) of the Vehicle Code further requires that local authorities complete "an engineering and traffic investigation when and in such manner as required by regulations promulgated by [PennDOT]" before taking any action under this Section. 75 Pa.C.S. § 6109(e).

Section 212.5(b)(iii) of PennDOT's regulations specifically requires local authorities to obtain PennDOT's written approval "before installing any new, or *revising* or removing any *existing* traffic-control device." 67 Pa. Code § 212.5(b)(1)(iii) (emphasis added); *see also* 67 Pa. Code § 212.5(b)(1)(i) (prohibiting local authorities from revising or removing "any traffic-control device installed by [PennDOT] or by a contractor for [PennDOT] without written approval of [PennDOT]"). Section 212.1 of PennDOT's regulations defines "[t]raffic-control devices" as "[s]igns, signals, markings and devices consistent with this chapter placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning or guiding traffic." 67 Pa. Code § 212.1. This Section further defines "[t]raffic signal" as including, *inter alia*, "traffic-control signals" and "pedestrian signals." *Id.*

As explained by our Supreme Court in *Starr*, "the Commonwealth and its subdivisions may not erect traffic control devices unless it is first determined, based upon a traffic and engineering investigation, that a particular device is an appropriate means of regulating traffic. . . ." *Starr*, 747 A.2d at 873 (citing 75 Pa.C.S. §§ 6105 (relating to PennDOT's authority to "establish by regulation the manner in which traffic and engineering investigations shall be carried out"), 6109(e), 6122(b) (relating to the standards for PennDOT approval), and PennDOT

16

regulations codified at 67 Pa. Code § 211).[7]  The proposed revision to the pedestrian push buttons for the traffic signals at the intersection of Highland Street and Eisenhower Boulevard, a state highway, requires PennDOT approval as a "prerequisite to municipal action" and, as such, Bender's expert must support his opinion as to the appropriateness of that revision "with an analysis of the same facts that [PennDOT] would consider when its approval is sought."  *Wenger*, 868 A.2d at 642.  Such an analysis was not contained within Bender's expert report.

Nevertheless, Bender asserts that *Starr* did not define what the phrase "engineering and traffic study" means and that the term is defined by the regulations, which provide:

> *Engineering and traffic study*--An orderly examination or analysis of physical features and traffic conditions on or along a highway, conducted in accordance with this chapter for the purpose of ascertaining the need or lack of need of specific traffic restrictions, and the application of traffic-control devices.

67 Pa. Code § 212.1.  This section, however, still requires that an engineering and traffic study be conducted in accordance with PennDOT regulations.  Bender's expert does not identify any study, upon which he relied, that was conducted in accordance with PennDOT's criteria for approval.  Bender's expert's conclusory statement that "these kinds of improvements would be approved for use by PennDOT and are commonly installed at signalized intersections where there is

---

[7] The regulations at 67 Pa. Code § 211 are now repealed because PennDOT updated its regulations in 2006, six years after the Supreme Court's decision in *Starr*.  PennDOT recodified its regulations under Chapter 212 of the Pennsylvania Code, 67 Pa. Code §§ 212.1-212.701.  As explained by PennDOT "both versions require a study before a traffic control device is approved[,]" but the "current iteration of the regulations adopts national standards for such studies."  67 Pa. Code § 212.2 (providing for the adoption of federal standards); PennDOT's Brief at 17, n.8.

17

pedestrian activity" does not address the appropriateness of the changes at the specific intersection at issue. R.R. at 245a. The "clear mandate of *Starr* is that a plaintiff must show that a proposed solution would effectively remedy a specific dangerous condition *at a particular location*." *Kosmack*, 807 A.2d at 932 (emphasis added).

Bender also claims that an engineering and traffic study can be conducted by a police officer, roadmaster, maintenance supervisor or traffic technician, and that an engineer need not be involved. Bender's Brief at 31 (citing 67 Pa. Code § 212.4(b)). However, notably, Bender's expert did not identify an engineering and traffic study upon which he relied, conducted by either himself or anyone else. The Vehicle Code and PennDOT regulations preclude approval in the absence of such a study and, per *Starr*, the plaintiff will be required to prove "more likely than not, PennDOT's approval *would have been forthcoming*." *Starr*, 747 A.2d at 874 (emphasis added). Without a study evaluating PennDOT's potential approval of a remedial measure that is part of Bender's proposal to remedy the situation at the intersection in question, the expert report is speculative, conclusory and insufficient as a matter of law. Without a sufficient expert report, Bender cannot establish a duty owed by PennDOT and/or the Township to remedy the alleged dangerous condition on Eisenhower Boulevard. Therefore, we conclude that the trial court's decision to grant summary judgment in favor of PennDOT and the Township was proper.

Accordingly, the trial court's orders are affirmed.[8]

_____
CHRISTINE FIZZANO CANNON, Judge

_____

[8] Based upon our disposition above, we need not address Bender's argument relating to immunity.

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allen C. Bender, Individually    :
and as Executor of the Estate of    :
Ruth A. Bender,    :
         Appellant    :
    :
    v.    :
    :
Commonwealth of Pennsylvania,    :
Department of Transportation,    :
Township of Swatara, and    :   No. 77 C.D. 2019
Adrian T. Horrell    :

O R D E R

AND NOW, this 30th day of June, 2020, the November 21, 2018 orders of the Court of Common Pleas of Dauphin County are AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge